IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs June 5, 2007

**GLEN COOK v. STATE OF TENNESSEE**

**Direct Appeal from the Criminal Court for Shelby County**
**No. P-23297    W. Fred Axley, Judge**

---

**No. W2006-01514-CCA-R3-PC  - Filed March 27, 2008**

---

The petitioner, Glen Cook, appeals the denial of his petition for post-conviction relief and argues that he received ineffective assistance of counsel and that he was sentenced improperly. Specifically, he argues that counsel failed to interview witnesses, never discussed trial strategy with the petitioner, and failed to file proper motions. After careful review, we affirm the judgment from the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which ALAN E. GLENN and J.C. MCLIN, JJ., joined.

Larry E. Copeland, Jr., Memphis, Tennessee, for the appellant, Glen Cook.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Assistant Attorney General; William L. Gibbons, District Attorney General; and Tracye N. Jones, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The petitioner and his twin brother were convicted of multiple offenses after a jury trial. Both brothers appealed their convictions, but this post-conviction appeal pertains to only Glen Cook. The facts underlying the petitioner's conviction were summarized by this court on direct appeal as follows:

> The record reflects that the defendants are identical twins. Christopher Funches testified that on April 14, 1996, he went to a party at Lake Point Apartments with his sister, Marti Funches, and Marti's fiancé, Tony Garrett. He said that as they left the party at about 2:00 a.m. and were walking down the steps, the defendants approached them. He said Mr. Garrett was in front of him and Ms. Funches, and one of the defendants struck Mr. Garrett in the face. He said Ms. Funches began

screaming, and he tried to calm her down. He said that one defendant had a revolver, and the other had a rifle or a shotgun.[1]

Mr. Funches testified that Defendant Two approached Mr. Garrett and threatened him. He said that Defendant One robbed Mr. Garrett and told him to get into Mr. Garrett's car. He stated that the defendants took Ms. Funches's jewelry, and they reached into Mr. Garrett's pockets and might have taken something. He testified that the defendants did not attempt to rob him but asked him if he had a pistol, which he did not. He said the defendants did not pat him down or search him. He said the defendants then forced the three of them into Mr. Garrett's car by pointing a pistol at them. He stated that he and Ms. Funches were in the backseat, Mr. Garrett was in the driver's seat, and Defendant One was in the front passenger seat. He said that Defendant Two followed them in another car. He said that in Mr. Garrett's car, Defendant One threatened to shoot Mr. Garrett. He said that he pleaded with Defendant One not to shoot Mr. Garrett because he and Ms. Funches were engaged. He testified that Defendant One said that if they told anyone of the incident, Ms. Funches would be a widow.

Mr. Funches testified that Defendant One forced Mr. Garrett to drive to the apartment Mr. Garrett and Ms. Funches shared at Perkins Woods. He said that when they arrived, Defendant One forced Mr. Garrett out of the car and into the apartment at gunpoint. He said that Defendant Two, who had a rifle, stayed with him and Ms. Funches at the car. He said that about ten to fifteen minutes later, Defendant One and Mr. Garrett came outside. He said that one of the defendants reached into Mr. Garrett's pocket and took some money. He said the defendants demanded money from Ms. Funches, but she did not have any. He said the defendants then got in their car and left. Mr. Funches testified that he feared for his life during the incident.

On cross-examination, Mr. Funches testified that light came from streetlights not far from the bottom of the steps at Lake Point Apartments and from lights in the stairwell. He said that he had seen the defendants before and that Mr. Garrett knew the defendants. He said that when Defendant One first approached Mr. Garrett, Defendant One said, "Where your sh** at." He said he could not hear whether Mr. Garrett said anything to Defendant One. He said the defendants took Ms. Funches's necklace at Lake Point Apartments. He stated that the defendants asked him "if he had anything, if he had a gun." He said he thought the defendants were asking him if he had any money and if he had a gun. He said that although he was never directly

---

[1] Although the victims were not able to identify the defendants individually by name, much of their testimony distinguishes between the two based upon which weapon the defendant was carrying. For purposes of this opinion, the defendant carrying the revolver will be referred to as Defendant One, and the defendant carrying the rifle, shotgun or pipe will be referred to as Defendant Two.

threatened, he felt his life was threatened because if they would kill Mr. Garrett, they would also kill him.

Mr. Funches testified that at Perkins Woods Apartments, Defendant Two stayed in the car with him and Ms. Funches, and he did not remember if Defendant Two had a gun. He said Defendant Two did not threaten them with a gun. He said that after Defendant One and Mr. Garrett came back outside, Defendant One went to the passenger side of the car and said, "Give me your money." He said that after they got money from Ms. Funches, they left. He said that Defendant Two never raised or pointed his gun.

Mr. Funches testified that they did not call the police that night because Ms. Funches was afraid. He said Ms. Funches was scared because the defendants knew where she and Mr. Garrett lived, and they had threatened to kill Mr. Garrett. He said that after the incident, Mr. Garrett told him that he knew the defendants as security guards. He said that Ms. Funches did not know the defendants.

On redirect examination, Mr. Funches testified that at Lake Point Apartments, the defendants asked him "if [he] had anything" and if he had a gun. He said he thought they were asking him if he had any money or a gun. He said he thought the defendants still had their guns at Perkins Woods Apartments.

Tony Garrett testified that he had a felony conviction for possession of cocaine. He stated that on April 14, he, his fiancee Marti Funches, and her brother Christopher Funches attended a party at Lake Point Apartments. He said that they left the party at about 2:00 a.m. and that as they went down the stairs, he noticed the defendants exiting a gray Chevrolet Cavalier. He said the defendants approached him and told him to "drop it off." He said Defendant One had a .38 caliber pistol and Defendant Two had a 12-gauge gun. He said he told the defendants that he did not have any money, and one of the defendants hit him in the eye. He said the defendants then searched his pockets and took eight hundred dollars from him. He testified that the money was part of Ms. Funches's income tax refund check that they had cashed earlier that day.

Mr. Garrett testified that Ms. Funches panicked, and the defendants took about thirty dollars and a herringbone necklace from her. He said that the defendants asked Mr. Funches what he had on him but that Mr. Funches did not have anything. Mr. Garrett stated that the defendants forced everyone into his car. He said that he was forced into the driver's side of the car, and one of the defendants got into the passenger's side and forced Mr. Garrett to drive to his and Ms. Funches's apartment at gunpoint. He said that Defendant Two followed them in the defendants' car. He stated that the defendants made threats and told Mr. Garrett that he was going to die and that Ms. Funches was going to be a widow.

Mr. Garrett testified that he was forced into his apartment at gunpoint by Defendant One while Mr. and Ms. Funches remained in the car with Defendant Two. He said Defendant One searched his apartment but did not find any money. He said Defendant One forced him back outside, and the defendants patted him down again. He said the defendants left when they realized that he did not have any more money, but they threatened to kill him if anyone called the police. He stated that because of these threats, Ms. Funches did not want to the call the police that night but that the next day he convinced her that they should notify the police.

On cross-examination, Mr. Garrett testified that he recognized the defendants' car from the neighborhood. He said the defendants approached him together, and they were both armed. He said that when one of the defendants told him to "drop it off," he thought they were demanding money from him. He said he did not recall if the defendants said anything about him having a gun that belonged to them. He said the defendants also told Ms. Funches to "drop it off." He said they searched Ms. Funches and took the money that was in her purse, and he said they asked Mr. Funches what he had, but he did not have anything.

Mr. Garrett testified that at Perkins Woods Apartments, Defendant Two threatened to shoot Mr. and Ms. Funches if they moved. He said that Defendant One did not ask him about a gun. He said he was not an acquaintance of the defendants, but he had known them for about four months and knew they worked as security guards. He stated that he might have given the defendants his pager number and that he had seen them the week before the incident at EZ Pawnshop. He said he did not know what they were looking at, and he did not know if the defendants bought guns at the pawnshop. He stated that he had not seen the defendants armed until the robbery. He testified that he did not own any guns until after the incident. Mr. Garrett stated that the defendants had paged him once, but they did not page him on the day of the incident, and he did not borrow a gun from them.

Mr. Garrett testified that he assumed Defendant Two was carrying a 12-gauge gun because half of the gun was sticking out, and he knew what a 12-gauge gun looked like. He said that nothing was taken at Perkins Woods Apartments because the defendants had already taken everything. He said the defendants asked Mr. Funches if he had any money, but Mr. Funches told them that he did not. He testified that he and Ms. Funches stayed in a hotel after the incident.

Mr. Garrett was shown a photograph of the defendants, and he described the defendant in photograph number 96400788-35 as the calm one. He stated that the defendant in the photograph appeared to be Linn Cook, but he was not positive because they were identical twins. He testified that he saw one of the defendants at Circle K after charges had been filed, and that defendant begged him to drop the charges. He said he later saw the calm one, and he denied telling that defendant that

he pressed charges because he was embarrassed about being hit in front of his fiancee.

Marti Funches testified that she, Mr. Garrett, and her brother left the party at Lake Point Apartments at about 2:00 a.m. on April 14. She said that as they walked down the steps, the defendants jumped out of their car and approached them. She said that one of the defendants had his hand down by his side. She said that Mr. Garrett knew the defendants and that he stated, "What's up Deuce Man." She said Defendant One pulled out a large silver .38 caliber gun, and she said it looked like Defendant Two had a stick or a pipe. She testified that the bottom of the stairs was unlit and she panicked.

Ms. Funches testified that Defendant One told Mr. Garrett to "drop that sh** off" and then struck Mr. Garrett. She said Defendant Two said "what you got" and took her necklace. She stated that Defendant Two told her and Mr. Funches not to move. She stated that Defendant One forced Mr. Garrett into the driver's side of his car and forced her and Mr. Funches into the backseat. She testified that Defendant One told her that she was going to be a widow, and she said she thought she was going to die.

Ms. Funches testified that Defendant One forced Mr. Garrett to drive to the apartment she shared with him, then Defendant One forced Mr. Garrett into the apartment at gunpoint while Defendant Two stayed with her and Mr. Funches. She said Defendant One and Mr. Garrett were in the apartment for about four or five minutes, and when they came out, the defendants forced Mr. Garrett into his car, then they got into their car and left. She said the defendants stated that they would come back for them if they called the police. She said she and Mr. Garrett dropped off Mr. Funches at their mother's house, then she and Mr. Garrett spent the night at Mr. Garrett's mother's house. She said she did not want to call the police because she was scared, but Mr. Garrett convinced her the next day that they should notify the police.

On cross-examination, Ms. Funches testified that she recognized the defendants. She said she had been in the car a couple of times when Mr. Garrett had seen the defendants walking on the street and had given them a ride. She said Mr. Garrett told her that the defendants were security guards. She stated that she did not keep guns in the apartment that she shared with Mr. Garrett. She said that on the night of the incident, she did not hear either defendant ask Mr. Garrett if he had a gun he was holding for them. She stated that the eight hundred dollars the defendants took from Mr. Garrett was part of the money from her income tax refund.

Ms. Funches testified that Defendant Two pointed an object at Mr. Funches that looked like a pipe or a stick. She said Defendant One asked Mr. Funches if he

had a gun, but the defendants did not search or pat down Mr. Funches. She testified that Defendant Two ripped off her necklace, and she gave them about thirty or thirty-five dollars. Initially, she said she gave them her money at Lake Point Apartments, but she later stated that she gave them her money at Perkins Woods Apartments. She said that she and Mr. Garrett stayed with Mr. Garrett's mother after the incident because all the hotels were booked. She said she was not aware of any guns kept in her apartment after the incident.

Officer Rodney Adair of the Memphis Police Department testified that he received a dispatch at about 3:00 p.m. on April 14 reporting shots fired at Lake Point Apartments. He said he spoke with security officers at the apartments who informed him that the suspects had left and might be headed toward Getwell Gardens. He said the suspects were described as two black males, possibly twins, driving a gray, four-door Chevrolet Cavalier.

Officer Adair testified that as he pulled into Getwell Gardens, the defendants were pulling out in a gray Cavalier. He said he turned on his blue lights, stopped the car, and ordered the defendants out of the car. He said he drew his weapon because he had information that the suspects were armed and had fired shots. He said that the passenger got out of the car, raised his hands, and dropped to the ground as ordered. He said the driver got out of the car and raised his hands, and he noticed that the driver was wearing a shoulder holster but did not have a weapon. He said the driver was being difficult and would not get on the ground as ordered. He said another officer arrived about ten seconds later, and the driver finally complied.

Officer Adair testified that he patted down the passenger and found six rounds of .38 caliber ammunition in his hands. He said neither defendant had weapons on them, but a search of the car produced two handguns and a shotgun. He said the weapons were in the front part of the car, and the shotgun and a handgun were loaded. He testified that ammunition was found in the trunk of the car.

On cross-examination, Officer Adair admitted that according to the arrest ticket, both defendants lay flat on the ground before other officers arrived. He testified that the barrel of the shotgun they recovered was hot, but he did not know if it was hot from lying in the sun. He said he had no knowledge of any spent shotgun shells or bullets found in the car.

Officer Paul Bishop of the Memphis Police Department testified that he was called to Eastwood Hospital at about 3:30 p.m. on April 14 to take a robbery report from the victims. He said that Mr. Garrett's left eye was swollen. He said he heard a call over the radio regarding shots fired, and he put out a broadcast regarding the robbery and kidnapping because he thought the descriptions of the suspects were similar.

-6-

Officer Monday Quinn of the Memphis Police Department testified that he received a call to go to Getwell Gardens on the report of shots fired. He said that when he arrived, the defendants were out of their car, and Officer Adair had his gun drawn and was ordering them to get on the ground. He said the passenger complied, but the driver did not. He said he asked the driver his name, and the driver said he was Glen Cook. He said the driver was wearing a shoulder holster. He stated that in the front of the car, he found a loaded, sawed-off shotgun containing six rounds of ammunition and two loaded .38 caliber handguns. He said he also found ammunition. On cross-examination, he stated that he did not see any spent shells in the car.

B.F. Hadaway, Jr., an investigator with the Tennessee Department of Commerce and Insurance Regulatory Boards, testified that the Boards regulate security companies and that one must go through a certain procedure to become a commissioned security officer in Tennessee. He said that one must file a lengthy application and undergo FBI and TBI background checks. He said that a person cannot work as an armed security guard in Tennessee until they have been certified by the state. The affidavit of Donna Hancock, Administrative Director of Tennessee Private Protective Security Guard Services, was admitted into evidence. In her affidavit, Ms. Hancock stated that a complete record search revealed that the defendants did not hold armed guard registration, nor was there any record of an application filed by the defendants. The defendants were convicted upon the foregoing evidence.

State v. Linn Cook and Glenn Cook, No. 02C01-9712-CR-00482, 1999 Tenn. Crim. App. LEXIS 627, at *3-17 (Tenn. Crim. App. June 30, 1999).

The post-conviction hearing occurred on two days. During the first post-conviction hearing, which was conducted on July 25, 2005, the petitioner testified that trial counsel should have called Officer Justin Fox to testify at trial to impeach the testimony of other officers concerning their involvement in the case. He also argued that the arrest ticket was falsified by police. He said that Officer Fox's testimony indicated that he did not arrest the defendant even though his name was on the arrest ticket. The petitioner claimed that the arrest ticket was falsified so the State could maliciously prosecute him and his brother.

The petitioner also argued that his attorney was ineffective because she only met with him once or twice while he was in jail and did not discuss trial strategy. He said he asked her to file a motion to suppress, but she failed to do so. The petitioner said he and his brother were never involved in a robbery or a kidnapping. He argued that the victims were "manufactured" and that he and his brother did not know them. The petitioner said that trial counsel failed to utilize the officer's testimony to impeach the State witnesses.

The petitioner testified that trial counsel did not share any discovery or discuss trial strategy with him. He said that neither his attorney nor his brother's attorney presented a defense for them at trial. The petitioner testified that counsel did not contact or interview any of the witnesses they suggested.

The petitioner said that he and his brother were both diagnosed with paranoid schizophrenia, but trial counsel did not investigate his illness. He said trial counsel did not communicate with him about his potential sentencing exposure and should have filed a motion to suppress the initial stop because the officers had fabricated probable cause.

During cross-examination, the petitioner testified that his attorney did nothing and that his brother's attorney offered the only argument before the court. He said that both of the officers listed on the arrest ticket testified at trial as to a "shots-fired" call but not to a robbery and kidnaping. All of the three alleged victims testified during the trial about a robbery that occurred to them at the hands of the petitioner and his brother. The petitioner said that he wanted a jury trial but said that the lack of action by his trial counsel allowed only the state's version to be presented to the jury. He also said that, because he was "gagged" by the judge, he did not have an opportunity to tell counsel the questions he wanted her to ask during cross-examination.

When confronted with his testimony during voir-dire, the petitioner agreed that he said he had reviewed the case with counsel. He also acknowledged that he testified that he had met with counsel several times regarding testimony elicited during the course of the trial. Further, he said he had met and discussed the case with counsel and had decided not to testify on his own behalf. The petitioner also said that counsel told him there was no need for him to testify because they were going to use the testimony of Officer Fox. He said they were led to believe counsel would call Officer Fox but, as soon as he agreed not to testify, counsel rested his case. He said he did not raise this to the trial judge at the time because he had been gagged by the trial judge and would have been removed from the courtroom if he had said anything.

The petitioner said that all the alleged victims were lying and that the offenses never occurred. The petitioner said counsel should have interviewed the person who owned the home where the events were alleged to have occurred. He said she was an alleged eyewitness and should have been called to testify.

The defense rested their proof at the conclusion of the petitioner's testimony. The hearing was then continued until September 22, 2005. Trial counsel testified that she was appointed to represent the petitioner at trial. Counsel testified that she had trouble with the petitioner during most of the time she was appointed to represent him. She said that she had tried one other criminal case involving an aggravated burglary. Counsel said she only recalled filing one motion in the case, and it was a motion for discovery. However, she was unable to locate her file in this matter and could not be certain that was the only motion filed. Counsel said that she ordinarily preserves her client files for a three-year period to a five-year period.

Counsel did not recall filing any written pretrial motions but did make an oral motion in limine before trial. She recalled the petitioner complaining that she did not file thirty-six motions. She believed the number "thirty-six" came from the petitioner being charged previously with other, more serious crimes that might require that many pretrial motions. Counsel testified that she did not recall any specific motions the petitioner asked her to file.

Counsel testified that she felt like she properly represented the petitioner. She said the petitioner filed a complaint with the Board of Professional Responsibility and complained that she did not make an objection to certain testimony regarding whether the police were responding to a "shots fired" call. It was her contention that she did make an objection at the outset and that the objection was continuing in nature. She said she shared the discovery materials with the petitioner.

Counsel testified that she was not aware that she could have asked for an investigator to be appointed to the petitioner. She believed that her investigation and the investigative work conducted by the co-defendant's counsel was sufficient. Counsel said that she did not interview the State's witnesses prior to trial. She went to the scene of the alleged crime. Counsel did not issue any subpoenas and did not put on any proof.

On cross-examination, counsel testified that she met with the petitioner ten to fifteen times prior to trial. She said she was unable to locate one of the people the petitioner wanted to testify. She participated in the cross-examination of the State's witness but let counsel for the co-defendant go first in cross-examination because the co-defendant's name was first on the indictment. If counsel for the co-defendant did not ask questions that she felt were necessary, she asked those questions. Counsel testified that it is her policy to ask her clients if they have additional questions they want asked before she finishes questioning the witnesses. She then makes an independent decision about whether or not their questions are relevant. She made sure the petitioner participated in the trial process, including questioning and jury selection. Counsel said that she tries to provide the client a copy of the entire file and that it mirrors closely the file she uses, with the exception of her attorney work product.

Counsel recalled having the petitioner evaluated because he had complained of problems with schizophrenia. She said that testing revealed he was competent to assist in preparation for trial and was competent to understand the consequences of his conduct.

Analysis

The petitioner contends that he was denied effective assistance of counsel and that he was sentenced improperly because he received sentences above the minimum range for each offense. Specifically, the petitioner argues that counsel was ineffective for failing to: interview the State's witnesses prior to trial; discuss trial strategy with him prior to trial; file motions that he wanted filed; and subpoena two witnesses, Officer Fox and Keisha Hare, he deemed important to his defense. Additionally, the petitioner contends that counsel was ineffective for failing to use his history of schizophrenia to his advantage.

This court reviews a claim of ineffective assistance of counsel under the standards of Baxter v. Rose, 523 S.W.2d 930 (Tenn. 1975), and Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). The petitioner has the burden to prove that (1) the attorney's performance was deficient, and (2) the deficient performance resulted in prejudice to the defendant so as to deprive him of a fair trial. Strickland, 466 U.S. at 687, 104 S. Ct. at 2064; Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996); Butler v. State, 789 S.W.2d 898, 899 (Tenn. 1990). The failure to prove either deficiency or prejudice justifies denial of relief; therefore, the court need not address the components in any particular order or even address both if one is insufficient. Goad, 938 S.W.2d at 370. In order to establish prejudice, the petitioner must establish a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694, 104 S. Ct. at 2068.

The test in Tennessee to determine whether counsel provided effective assistance is whether his or her performance was within the range of competence demanded of attorneys in criminal cases. Baxter, 523 S.W.2d at 936. The petitioner must overcome the presumption that counsel's conduct falls within the wide range of acceptable professional assistance. Strickland, 466 U.S. at 689, 104 S. Ct. at 2065; State v. Honeycutt, 54 S.W.3d 762, 769 (Tenn. 2001). Therefore, in order to prove a deficiency, a petitioner must show "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad, 938 S.W.2d at 369 (citing Strickland, 466 U.S. at 688, 104 S. Ct. at 2065).

In reviewing counsel's conduct, a "fair assessment . . . requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Nichols v. State, 90 S.W.3d 576, 587 (Tenn. 2002) (citing Strickland, 466 U.S. at 689, 104 S. Ct. at 2065). The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation. Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997); Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982).

Here, the post-conviction court found that the police officer's testimony would not have provided any help to the petitioner since the officer's testimony during the preliminary hearing did not contradict any of the testimony elicited at trial. Further, we note the petitioner did not call Officer Fox to testify at his post-conviction hearing. "When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990); see also Scott v. State, 936 S.W.2d 271, 273 (Tenn. Crim. App. 1996). As a general rule, this is the only way the petitioner can establish that (1) a material witness existed who could have been discovered but for counsel's negligent investigation of the case; (2) a known witness was not interviewed; (3) the failure to discover or interview the witness caused him prejudice; or (4) the failure to present a known witness resulted in the denial of critical evidence which caused the petitioner prejudice. Black, 794 S.W.2d at 757. Neither the trial court nor this

court can speculate on what a witness's testimony might have been if introduced by counsel. Id. Therefore, this issue is waived.

With regard to the petitioner's contention that counsel was ineffective for not producing Keisha Hare as a witness at trial, we also conclude the issue is without merit. The petitioner did not provide any valid information to aid counsel in locating the proposed witness. Counsel testified that she unsuccessfully tried to locate the witness. Because he failed to produce the proposed witness during the post-conviction hearing, the petitioner has waived this issue. See Id.

The post-conviction court found that counsel was not ineffective in her investigation of the petitioner's case. The petitioner contends that counsel was not adequately prepared to defend his case and specifically contends that counsel's failure to interview the witnesses for the State was prejudicial to his case. It is the petitioner's burden to establish that there existed a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Here, the petitioner has not provided any proof that additional investigation would have been beneficial. He has not produced any witnesses who could substantiate his claims that there were inconsistencies in the evidence. We conclude that the petitioner has failed to show that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms. It might have been beneficial for counsel to interview the police prior to trial but "might" is inadequate for the petitioner to meet his burden. Counsel testified that she had all the discovery materials she felt she needed, including the arrest ticket and related materials, to review prior to trial.

In his brief, the petitioner makes a brief mention that he was greatly prejudiced by the absence of a motion to sever his case from that of his twin brother. However, he provides no authority to support his contention. This issue is waived as the petitioner has failed to cite authority to support his argument. Tenn. Ct. Crim. App. R. 10(b); State v. Schaller, 975 S.W.2d 313, 318 (Tenn. Crim. App. 1997).

The petitioner also contends counsel was ineffective for failing to contact his friends and doctors regarding his diagnosis as a paranoid schizophrenic. However, the State correctly points out that counsel testified she had the petitioner evaluated and the resulting diagnosis found him to be competent to stand trial and participate in his defense. Again, the petitioner failed to call any witnesses to support his contentions and has failed to meet his burden of proof.

With regard to the effective assistance of trial counsel, the petitioner has failed to meet his burden of proof, and the judgment from the trial court is affirmed.

The petitioner also argues that he was sentenced improperly. He argues that his sentence violated Blakely v. Washington, 542 U.S. 296 (2004), because the trial court enhanced his sentence. The State argues that he did not raise this issue on direct appeal and has thus waived this claim pursuant to Tennessee Code Annotated section 40-30-106(g). We conclude that the petitioner's claim must fail even if a Blakely violation occurred. This court has previously held that Blakely does

not apply retroactively to cases on collateral appeal. See Billy Merle Meeks v. Ricky J. Bell, Warden, No. M2005-00626-CCA-R3-HC, 2007 Tenn. Crim. App. LEXIS 962, at *17 (Tenn. Crim. App., Nashville, Nov. 13, 2007). This court, in the unreported decision of Meeks v. Bell, concluded that the weight of authority stemming from Cunningham v. California, 549 U.S. ___, 127 S. Ct. 856 (2007) and Apprendi v. New Jersey, 530 U.S. 466, 120 S. Ct. 2348 (2000), and its progeny are contrary to the petitioner's assertions which are mirrored here by the petitioner. As to the retroactive application of Blakely, we conclude, as the court in Meeks concluded, that the holdings of Blakely are not to be applied retroactively. Meeks, No. M2005-00626-CCA-R3-HC, 2007 Tenn. Crim. App. 962, at *19. Additionally, this court has previously held that Blakely does not apply retroactively to cases on collateral appeal in the post-conviction setting. See Timothy R. Bowles v. State, No. M2006-01685-CCA-R3-HC, 2007 Tenn. Crim. App. LEXIS 355, at *7-8 (Tenn. Crim. App. at Nashville, May 1, 2007); Carl Johnson v. State, No. W2003-02760-CCA-R3-PC, 2005 Tenn. Crim. App. LEXIS 65, at *11-12 (Tenn. Crim. App. at Jackson, Jan. 25, 2005). Therefore, the petitioner is not entitled to any relief on this issue.

## Conclusion

Based on the foregoing and the record as a whole, we affirm the judgment from the post-conviction court.

_____
JOHN EVERETT WILLIAMS, JUDGE